UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GUY BUCK,

      Petitioner,

v.                                   Case No. 2:14-cv-93
                                   HON. GORDON J. QUIST

DUNCAN MACLAREN,

      Respondent.

_____/

## **REPORT AND RECOMMENDATION**

Petitioner Guy Buck filed this petition for writ of habeas corpus challenging his jury conviction for first-degree murder (felony murder).  Petitioner was sentenced to imprisonment for life without the possibility of parole.  The respondent has filed an answer and has complied with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.  The parties have briefed the issues and the matter is now ready for decision.

Petitioner alleges that:

I. The Michigan Court of Appeals incorrectly wrote that "newly discovered impeachment evidence cannot be [the] basis for a new trial because it is merely cumulative."  Furthermore, due process requires a new trial based on newly discovered evidence that the prosecution's star witness perjured himself at trial and has disclaimed his testimony against Petitioner.

II. The trial court abused its discretion by admitting the out-of-court statements of a non-testifying co-conspirator and the court of appeals incorrectly found this error to be harmless.

III. Due process requires a new trial where, in the middle of trial, the eventual foreman of the jury expressed fear that the defendant was dangerous and would retaliate against him.

IV. Petitioner was deprived of his rights of due process and fair trial, cross-examination, and confrontation when a declarant was allowed

to testify about an out-of-court statement allegedly made by a non-testifying co-defendant.

V. Petitioner was denied his constitutional right to testify and to have the effective assistance of counsel when defense counsel induced Petitioner to unintelligently waive his right to testify.

VI. Prosecutorial misconduct deprived Petitioner of his right to a fair trial where the prosecutor incorrectly implied Petitioner had an obligation to come forward with his version of events before trial, and where the prosecutor used Petitioner's pre-arrest silence as substantive evidence of guilt to felony murder.

VII. The trial court's jury instruction on great bodily harm unconstitutionally relieved the prosecution of its burden of proof on an essential element of felony murder and deprived Petitioner of his right to a fair trial and a properly instructed jury.

VIII. The trial court failed to instruct the jury sua sponte on second-degree murder, thereby depriving Petitioner of his right to a fair trial.

IX. Petitioner's conviction for felony murder must be reversed because the prosecution has failed to prove Petitioner's guilt for first-degree felony murder beyond a reasonable doubt.

X. Petitioner was denied his right to effective assistance of counsel when counsel (a) failed to secure Petitioner's right to confrontation; (b) erroneously advised defendant not to testify; (c) failed to object when the prosecutor implied that Petitioner had an obligation to tell his version of the events and used Petitioner's silence as substantive evidence; (d) failed to object to erroneous jury instructions; (e) failed to request a second-degree murder instruction; (f) failed to challenge the sufficiency of the evidence; and (g) failed to file necessary motions to protect Petitioner's inherent rights.

XI. Petitioner was denied the effective assistance of appellate counsel on direct review when appellate counsel failed to raise the significant and obvious Claims IV-X.

XII. Petitioner is unconstitutionally deprived of his liberty where he is "factually and actually innocent" of the offense underlying his conviction and imprisonment.[1]

---

[1] Respondent's brief opposing Petitioner's petition for writ of habeas corpus lists only nine

(continued...)

In April of 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective.  Because this petition was filed after the effective date of the AEDPA, this Court must follow the standard of review established in that statute.  Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  The Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."  *Id.*  A state court decision will be

---

[1](...continued)
claims.  PageID.100, ECF No. 5.  However, this merely numerical difference is due to the fact that Respondent discussed Claims V-VII under Claim IV.  *See* PageID.134 n.4, ECF No. 5.

deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 412. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Petitioner claims that due process requires a new trial based on newly discovered evidence that the prosecution's star witness perjured himself at trial. The Michigan Court of Appeals rejected this claim stating:

Approximately three months after Buck's trial and conviction, [co-defendant] Benson wrote a letter to the trial court recanting his testimony. Benson indicated that he had testified falsely to avoid a life sentence. Benson's letter placed responsibility for the assault on [co-defendant] Dulak, and the letter indicated that neither Benson nor Buck ever struck [the victim]. This Court remanded for an evidentiary hearing to determine whether Buck was entitled to a new trial on the basis of this newly discovered evidence. At the evidentiary hearing, Benson testified that his testimony in Buck's trial was true and accurate, and that he only wrote the letter in question to avoid being labeled a "snitch." The trial court subsequently denied Buck's motion for a new trial.

## II. NEWLY DISCOVERED EVIDENCE

Buck first argues that the trial court abused its discretion by denying his motion for a new trial. This Court reviews a trial court's ruling on a motion for a new trial premised on newly discovered evidence for an abuse of discretion. *People v Davis*, 199 Mich App 502, 515; 503 NW2d 457 (1993). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Carnicom*, 272 Mich App 614, 617; 727 NW2d 399 (2006).

For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) "the evidence itself, not merely its materiality, was newly discovered"; (2) "the newly discovered evidence was not cumulative"; (3) "the party could not, using reasonable diligence, have discovered and produced the evidence at trial"; and (4) the new evidence makes a different result probable on retrial. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), quoting *People v Johnson*, 451 Mich 115, 118 n 6, 545 NW2d 637 (1996).]

Newly discovered impeachment evidence cannot be the basis for a new trial because it is merely cumulative. *People v Barbara*, 400 Mich 352, 363; 255 NW2d 171 (1977). "However, the discovery that testimony introduced at trial was perjured may be grounds for ordering a new trial." *Id.*

Michigan courts are reluctant to grant a new trial on the basis of recanted testimony because recanted testimony is "traditionally regarded as suspect and untrustworthy." *People v Canter*, 197 Mich App 550, 559-560; 496 NW2d 336 (1992). Nevertheless, it is within the trial court's discretion to grant a new trial on the basis of recanted testimony. See *People v Cress*, 250 Mich App 110, 137-138; 645

NW2d 669 (2002), reversed on other grounds 468 Mich 678 (2003). In evaluating a trial court's decision to grant or deny a new trial on the basis of recanted testimony, this Court will defer to the trial court's superior ability to judge the credibility of the recanting witness.

Buck contends that he deserves a new trial so that he can use the letter in which Benson recanted to impeach Benson's testimony. We need not decide whether the letter could be used for this purpose because, even assuming that it could, we conclude that a different result would not be probable on retrial. First, the jury would hear multiple witnesses testify that Buck returned to his Wisconsin apartment with blood on his pants and a forensic expert would testify that this blood was a DNA match for Keller. This evidence strongly indicates that Buck was directly involved in the assault. Second, the jury would hear that in a letter Buck wrote while in jail, he referred to another man in writing, "I wish it was him that I killed." With this letter, Buck essentially admitted that he participated in Keller's murder. Third, and most importantly, the jury would hear Benson testify in a manner consistent with his testimony in Buck's first trial. Even if Benson's letter were admitted, it would have minimal impeachment value. At Buck's trial and the evidentiary hearing, Benson repeatedly linked Buck to the assault. Moreover, Benson's letter would likely be disregarded by the jury because Benson would presumably reiterate his trial testimony and would also presumably reiterate that the letter was written under the pressure of being labeled a jailhouse "snitch." Finally, considering the entirety of Benson's statements regarding the crime in question, the statements supporting a felony murder conviction appear more credible than the statements in the letter. Benson's letter, therefore, does not make a different result more likely on retrial.

In *Canter*, 197 Mich App 550, the trial court "questioned the veracity of [the witness's] recanting testimony" and noted that the witness had testified consistently with her trial testimony in other proceedings. *Id.* at 560-561. This Court held that the trial court's decision to deny the defendant's motion for a new trial on the basis of this newly discovered evidence was not an abuse of discretion. *Id.* at 561-562. In this case, the trial court's decision had even greater support because Benson disavowed his letter of recantation at the evidentiary hearing. Accordingly, we cannot conclude that the trial court abused its discretion when it denied Buck's motion for a new trial on the "newly discovered" evidence that Benson had written a letter recanting his earlier trial testimony.

- 6 -

Michigan Court of Appeals Opinion, PageID.1600-1601, ECF No. 6-16.

The Supreme Court stated that, to warrant habeas relief, "'[newly discovered] evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.' This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (emphasis omitted) (quoting *Townsend v. Sain*, 372 U.S. 293, 317 (1963)). *See Monroe v. Smith*, 41 F. App'x 730, 732 (6th Cir. 2002). A minority of courts within the Sixth Circuit has adopted the "more liberal application of this rule" set forth, e.g., in *White v. Keane*, 51 F. Supp. 2d 495, 502-03 (S.D.N.Y. 1999) which calls for a new trial only if the new evidence is "so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause not to afford a defendant a new trial at which the evidence could be considered" or if petitioner makes at least a "truly persuasive demonstration of innocence." *See, e.g., Guidry v. Sheets*, 452 F. App'x 610, 613 (6th Cir. 2011) (noting that state court findings regarding the credibility of recantation testimony are presumed correct under AEDPA and can be overcome only "by clear and convincing evidence"); *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 606 (E.D. Mich. 2001) (following *White*, but holding that new evidence that merely impeaches a witness does not form an adequate basis for a new trial). However, the majority holds that a petitioner's claim to relief "based upon the failure of a state trial judge to grant him a trial on the basis of newly discovered evidence is not cognizable in a habeas proceeding." *Monroe v. Smith*, 197 F. Supp. 2d 753, 763 (E.D. Mich. 2001) (citing *Dickey v. Dutton*, 595 F. Supp. 1, 2 (M.D. Tenn. 1983) (quoting *Townsend*, 372 U.S. at 317)); s*ee, e.g., Hall v. Grant*, 84-1531, 1985 WL 13926, at *4 (6th Cir. Nov. 20, 1985) (quoting *Townsend*, 372 U.S. at 317), *Vesey v. Scutt*, No. 2:09–CV–14207, 2012 WL

6725889, at *31 (E.D. Mich. Dec. 27, 2012), *Hall v. Prelesnik*, No. 1:08-cv-14889, 2011 WL

23312188, at *11-12 (E.D. Mich. June 9, 2011), *Austin v. Mack*, No. 1:03CV323, 2005 WL

1652533, at *8-9 (S.D. Ohio July 11, 2005); *Hence v. Smith*, 37 F. Supp. 2d 970, 980 (E.D. Mich.

1999).

      The Supreme Court held that federal habeas courts have "no license to redetermine

credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."

*Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).  "Recanting affidavits and witnesses are viewed

with extreme suspicion." *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007); *Smith v. Booker*,

No. 07-cv-15274, 2010 WL 451054, at *5 (E.D. Mich. Jan. 29, 2010).  Furthermore, "[t]he posttrial

recantation of an accomplice witness . . . does not warrant habeas relief since such evidence goes to

the merits of the conviction, not its legality."  *Hence*, 37 F. Supp. 2d at 980.

      Keith Benson was the only eyewitness concerning the events in the victim's home

that led to Petitioner's imprisonment.  At Petitioner's trial, Benson testified that when it came to

devising the plan to rob the victim before driving from Wisconsin to the victim's Michigan home,

co-defendant Dulak was "the leader" who said that "he knew a guy . . . we could rob," someone who

had "ripped him off," while Petitioner "just tagged along."  PageID.1283-1284, ECF No. 6-10;

PageID.1347, ECF No. 6-11.  Benson testified that when the three men arrived at the victim's home,

Benson and Petitioner went to the front door and were let in by the victim, while Dulak went "to the

side of the . . . house."  PageID.1294, 1296, ECF No. 6-10.  Benson stated that once inside, Benson

punched the victim once as planned.  PageID.1299, ECF No. 6-10.   According to Benson's

testimony, the handicapped, "doped up" victim fell to the ground, and Petitioner told the victim "that

we didn't want to hurt him"; however, "when [the victim] got back up, [Petitioner] started hitting

him" by "[p]unching him in the face, nose [and] eyes" with his fists.  PageID.1092, 1300-1302, ECF

No. 6-10; PageID. 1349-1350, ECF No. 6-11.  Benson stated that the victim fell down once again

and that when he got back up, the victim "gets hit some more from" Petitioner.  PageID.1303, ECF

No. 6-10.  According to Benson, the victim "kept getting up, walk over here, get hit some more" by

Petitioner.  PageID.1305, ECF No. 6-10.  Benson testified that Petitioner hit the victim "[n]umerous

times," "[a] bunch of times," "over 20 times," and "was about to hit him with the- the head of the

hammer," but was dissuaded from doing so by Benson and used the handle instead; Petitioner also

"put his hand behind [the victim's] head and kneed him [in the face].  Forced his head to the knee"

while the victim was "[s]tanding up in the living room."  PageID.1308, 1311, 1315, ECF No. 6-10;

PageID. 1367, 1369, ECF No. 6-11.  Yet, according to Benson's testimony, Petitioner "never once

kicked" the victim.  PageID.1370, ECF No. 6-11.

   Once Dulak came into the living room, Benson testified that Dulak too "started

beating on" the victim.  PageID.1308, ECF No. 6-10.  In fact, according to Benson's testimony,

Dulak "punched [the victim] a bunch of times real fast and kicked him with a foot a bunch of times

real fast . . . [i]n the head."  PageID.1309, ECF No. 6-10.  Benson testified that Dulak "was like

stomping on back of [victim's] head" with his boots and that he did that "[n]umerous times" – "at

least 12 to 20 times" – but did not "kick like you're kicking a soccer ball or football."  PageID.1316,

ECF No. 6-10; PageID.1351-1353, ECF No. 6-11.  Benson also testified that Dulak "did most of the

beating."  PageID.1369, ECF No. 6-11.  Benson testified that when driving away from the victim's

home, "Dulak said [the victim] recognized him."  *Id.*

   The victim was found dead by his sister hours after the robbery.  PageID.626-627,

637-638, ECF No. 6-8.  However, Benson stated that neither Dulak nor Petitioner intended to kill

the victim, but he also testified that Dulak had told his two accomplices on their way to the victim's

home, "don't let me kill him."  PageID.1307, ECF No. 6-10.

After his arrest and about a week after the crime, Petitioner wrote a letter to his ex-girlfriend.  In it, he stated about her new boyfriend, "you know how much I hate him.  I wish that was him that I killed."  PageID.777, ECF No. 6-8.  He also stated that "[t]his was [Dulak's] idea.  Wait 'til I get my hands on him[!!!]" *Id.*

A forensics expert testified that the victim's blood was found on Petitioner's pants and shoes, but also on Dulak's bandana and belt.  PageID.1237, ECF No. 6-10, PageID. 1430-1431, 1434-1440, ECF No. 6-11.  Two medical expert witnesses testified that the victim's death was caused by injuries to the head. PageID.1140, 1182, ECF No. 6-10.  The first medical expert noted that the victim's nose "was scraped, but not broken."  PageID.1161, ECF No. 6-10.  He testified that while the victim's injuries around his mouth could be caused by fists, the injuries in the temple areas were not caused by being kneed in the frontal area, but by being kicked in the head; the type of biker boots worn by Dulak "is heavier and more capable of causing injury" than the tennis shoes worn by Petitioner.  PageID.1157-1161, ECF No. 6-10.  The second medical expert concurred that being kneed, a move "used so widely in- in the martial arts," "does not have that critical damaging effect upon the brain."  PageID.1190, ECF No. 6-10.

Both experts testified that the victim's inner brain injuries that were the "most immediately fatal" were more consistent with kicks than with fist blows.  PageID.1166-1168, 1186, ECF No. 6-10.  Both experts concurred that the brain injuries sustained by the victim were similar to those of people involved in car crashes.  PageID.1155, 1185, ECF No. 6-10.

At the end of a five-day trial, the prosecutor pointed out to the jury the special nature of Benson's testimony as that of an accomplice.  However, the prosecutor argued that the testimony was substantially credible to support convicting Petitioner at least as an aider and abetter to felony murder.  PageID.1454, 1457, 1478, ECF No. 6-11.  The court instructed the jury to "consider an

accomplice's testimony more cautiously than that of an ordinary witness." PageID.1489-1490, ECF No. 6-11. The court, furthermore, told the jury that Petitioner was "charged with committing felony murder . . . or intentionally assisting someone else in committing it." PageID.1493, ECF No. 6-11. The jury returned a guilty verdict. PageID.1512, ECF No. 6-11.

About ten weeks after Petitioner was sentenced, Benson mailed a letter to the trial judge, stating, "I would like to make a full confession. I was threatened with life by attorney, DA, and the detective to say things that were not true in trial for a 20 year plea to put Buck & Dulak away for life. I'm sorry for that. I did what they wanted even though it was wrong." PageID.1712, ECF No. 6-16 (spelling corrected). Benson's letter then went on to give an account of the events at the victim's home that was different from his trial testimony (*Id.*) (spelling corrected):

> [The victim] said, "Come in." So I did, Buck right behind me. I pushed [the victim] down to put tape on him. Before we could get [the victim] taped up Dulak came in and started beating [the victim]. . . . On one of the many trips [from victim's home] to the truck I saw Dulak kicking [the victim] 12-20 times. On another trip, I saw tape on [the victim's] eyes and Dulak asked me to help tape up his arm. I said, "No. His pants are down." So Buck and I went and told Dulak to stop.

After the Michigan Court of Appeals had granted Petitioner's motion to remand, the trial court held an evidentiary hearing to determine whether to grant Petitioner's motion for a new trial based on this new piece of evidence. During this hearing, Benson testified that his testimony at trial was true and that he had written the letter to the judge because Petitioner had asked him to do so after accusing him of being "a rat." PageID.1577-1579, ECF No. 6-15. The trial court denied Petitioner's motion for a new trial because Benson, under oath, affirmed his trial testimony as true and retracted the letter, not written under oath, to the extent it conflicted with his earlier testimony. PageID.1593-1594, ECF No. 6-15. Therefore, Petitioner's "new evidence" evaporated when Benson

retracted it at the evidentiary hearing. The trial judge, having observed both Benson's testimony at trial and his testimony at the latter hearing, found credible what Benson said under oath on both occasions.

Petitioner also claims that the Michigan Court of Appeals stated incorrectly that "newly discovered impeachment evidence cannot be the basis for a new trial because it is merely cumulative." The Supreme Court held that " it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," unless these violate the constitution, statutes, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). *See Pulley v. Harris*, 465 U.S. 37, 41 (1984) and *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993).

Here, Petitioner argues that *People v. Grissom*, 492 Mich. 296 (2012), controls and that the Michigan Court of Appeals reliance on *People v. Barbara*, 400 Mich. 352, 363 (1977), was error. However, the Michigan Court of Appeals reviewed Petitioner's new evidence based on the four-part test enunciated in *People v. Cress*, 468 Mich. 678, 692 (2003), because the new evidence raised the issue of perjury. This is the same test used in *Grissom*, and is based on Michigan and federal precedent. *See Grissom*, 492 Mich. at 299-300. Unsurprisingly, the Michigan Supreme Court, after reviewing Petitioner's application for leave to appeal, summarily rejected Petitioner's application. PageID.1761, ECF No. 6-17. Moreover, since Petitioner does not raise any federal issues at this point, this claim is not cognizable under AEDPA. In the opinion of the undersigned, the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that the trial court abused its discretion when it admitted hearsay testimony concerning Petitioner breaking the victim's nose. That statement was allegedly made by Dulak, a non-testifying co-conspirator. The Michigan Supreme Court rejected both parts of this claim summarily. PageID.1761, ECF No. 6-17. The Michigan Court of Appeals rejected the first part of the claim stating:

> Buck next argues that Dulak's statement regarding Keller's nose should not have been admitted because it was hearsay and did not qualify for admission as an excited utterance. This Court reviews a trial court's decision concerning the admission of evidence for an abuse of discretion. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008).
>
> Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay statements are generally inadmissible. *Yost*, 278 Mich App at 363, citing MRE 802.
>
> Two witnesses testified that Dulak made a statement about Buck breaking Keller's nose. The trial court sustained an objection when Buck argued that it was hearsay. However, it then allowed the statement under the excited utterance exception. See MRE 803(2). Even assuming that Dulak's statement constituted hearsay, see *People v Martin*, 271 Mich App 280, 316-318; 721 NW2d 815 (2006) (explaining that a statement by a coconspirator made during the course and in furtherance of the conspiracy is not hearsay), and was inadmissible under the exception provided under MRE 803(2), we conclude that any error in its admission was harmless. In the face of the other evidence presented in this case, it cannot be said that the jury's verdict turned on whether Buck broke Keller's nose. Benson's testimony describing Buck's actions during the robbery was far more incriminating. Moreover, there was blood on Buck's clothes that was a DNA match for Keller, indicating he was personally involved in the beating. Finally, Buck confessed to the robbery and he said in a letter that "I wish it was [Bob] that I killed," implying that he understood that he was responsible for Keller's death. Given the overwhelming evidence of Buck's guilt, any error in the admission of evidence indicating that he broke the victim's nose would be harmless. See *People v Lukity*, 460 Mich 484, 494-496; 596 NW2d 607 (1999).

Michigan Court of Appeals Opinion, PageID.1602-1603, ECF No. 6-16.

The Supreme Court held that determinations of state evidence rules are not cognizable in a federal habeas proceeding, unless these determinations violate federal rights. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Markham v. Smith*, 10 F. App'x 323, 325 (6th Cir. 2001). Petitioner's second claim was originally raised on appeal as a "non-constitutional error." PageID.1632, ECF No. 6-16. Therefore, to the extent that Petitioner's claim alleges violations of state evidentiary rules, his claim is not cognizable.

However, Petitioner restated this hearsay claim as a federal question in his April 2013 brief supporting his motion for relief from judgment (Claim IV, above), alleging a due process violation under the Fourteenth Amendment as well as a violation of his rights to a fair trial, cross-examination, and confrontation under the Sixth Amendment. PageID.1839, ECF No. 6-18. The trial court, invoking Mich. Ct. R. 6.508(D)(3), denied Petitioner's motion for relief from judgment based on these grounds because they "could have been raised by the Defendant's appeal to the Court of Appeals and/or application for leave to the Supreme Court" and because "[t]he Defendant has not alleged good cause for failure to raise such grounds on appeal nor has he demonstrated actual prejudice from the alleged irregularities." PageID.1901, ECF No. 6-19. Both the Michigan Court of Appeals and the Michigan Supreme Court summarily denied Petitioner's application for leave to appeal from this denial citing Mich. Ct. R. 6.508(D). PageID.1903, ECF No. 6-20; PageID.1963, ECF No. 6-21.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107, 129 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, a habeas court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the

last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

To determine whether Petitioner has been denied relief based on a procedural default, habeas courts look to the last "reasoned judgment rejecting the [federal] claim." *Nunnemaker*, 501 U.S. at 803. The doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). In *Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010), the Sixth Circuit, in an *en banc* decision, held that brief form orders by the Michigan appellate courts invoking Mich. Ct. R. 6.508(D) are unexplained orders within the meaning of *Nunnemaker*. Such form orders are presumed to uphold or reject the last reasoned decision below. *Id.* at 291-92 (citing *Nunnemaker*, 501 U.S. at 803). As a result, absent an explained decision from some Michigan court applying Rule 6.508(D), the federal court may not invoke procedural default to dispose of a habeas claim that has been rejected by the Michigan courts on the grounds of Mich. Ct. R. 6.508(D).

A state law procedural rule is independent and adequate when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). The Supreme Court has repeatedly recognized, however, that "the adequacy of state procedural bars to the assertion of federal questions . . . is not within the State's prerogative finally to decide; rather

adequacy is itself a federal question." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotations omitted) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).

To excuse the procedural defaulted of a federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception can only be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Carrier*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Isaac*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Factors that may establish cause include interference by officials, attorney error rising to the level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available.  *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004) (citing *McClesky*, 499 U.S. at 493-94)).

To serve as cause to excuse the default, a claim of ineffective assistance of appellate counsel must survive scrutiny under *Strickland v. Washington*, 466 U.S. 668 (1984).  *McFarland v.*

*Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). In *Strickland*, 466 U.S. at 687-88, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), this review is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011); *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA") (citing *Harrington*, 562 U.S. at 102).

Finally, there is no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland*, 356 F.3d at 699 (citing *Greer*, 264 F.3d at 676). As the Supreme Court observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Here, Petitioner raised his federal claims regarding the admission of hearsay evidence at trial first in his brief supporting his motion for relief from judgment. He thereby failed to comply with the applicable state procedural rule, Mich. Ct. R. 6.508(D)(3). The trial court relied on this rule in denying relief based on this claim. Federal courts deem this rule to be independent and adequate for purposes of barring further consideration of the issue in federal courts. *See Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012); *McFarland*, 356 F.3d at 698. Therefore, Petitioner's claim is procedurally defaulted.

To overcome this bar to habeas relief, Petitioner attempts to show cause by alleging that his right to effective assistance to appellate counsel was denied when appellate counsel failed to raise this claim also as a federal question. PageID.1887-1890, ECF No. 6-18. Petitioner attempts

to overcome this bar, second, by claiming "the miscarriage of justice exception announced in" *Murray v. Carrier*, 477 U.S. 478 (1986), asserting under Claim XII that he is "factually and actually innocent." PageID.1891-1893, ECF No. 6-18. Petitioner's claim of actual innocence is not based on any "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup* , 513 U.S. at 324). Petitioner's "new evidence" has already been found to be unreliable.

To overcome the procedural bar, Petitioner must show there was a reasonable probability that these claims would have altered the outcome of his appellate proceedings. *See McFarland*, 356 F.3d at 699. Alleged errors concerning the Confrontation Clause of the Sixth Amendment are not deemed prejudicial in every case and are instead subject to harmless-error review. *Delaware v. Van Arsdall*, 475 U.S. 673, 680-81 (1986). A confrontation error is harmless if it did not have "substantial and injurious effect or influence in determining the jury's verdict." *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *Cook v. Smith*, 471 F. App'x 437, 440 (6th Cir. 2012). To gauge this effect or influence on the jury, the Sixth Circuit applies the five factors set forth in *Van Arsdall*, i.e., "(1) the importance of the witness' testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case." *Vasquez*, 496 F.3d at 574 n.8 (internal quotation marks omitted) (quoting *Van Arsdall*, 475 U.S. at 684).

At Petitioner's trial, one witness testified concerning statements made after Petitioner, Benson, and Dulak returned from the victim's home: "And, um, I remember when I first woke up,

I believe it was that- I believe it was [Petitioner] that said I can't believe that it made that noise.  And [Dulak] had said, [the victim's] nose breaking."  PageID.1020, ECF No. 6-9.  A second witness testified about the same exchange: "I was coming out of the bedroom and [Petitioner] and [Dulak] were talking, and [Petitioner] said that that's one noise- that's one noise or sound that I'll never get out of my head."  The witness testified that Dulak then said, "you mean when you punched that guy with a fist, broke- something about breaking his nose."  The witness, asked about Petitioner's response, testified, "I don't know, they kinda just both caught a glimpse of me and then he was like, yah, yah."  PageID.1056, ECF No. 6-9.  Petitioner's trial counsel objected twice to the first witness's statement on hearsay grounds, but the court, after sustaining the first objection, overruled the second one and allowed the statement under an excited utterance exception to the hearsay rule pursuant to MRE 803(2).  PageID.1020-1022, ECF No. 6-9.

Applying the *Van Arsdall* factors, first, this testimony was important for the prosecution's case only to the extent it corroborated the prosecution's main witness's testimony.  The prosecutor stated in his closing argument: "Does that corroborate Keith [Benson]'s testimony that he saw . . . [Petitioner] knee [the victim] in the face?  Now, we know- we know that [the victim], even though he was beaten badly, it didn't appear he had a broken nose.  But [these witnesses], they corroborate Keith Benson's testimony about the knee to Mark's head."  PageID.1495, ECF No. 6-11.  Second, the testimony was not cumulative since only these two witnesses testified to this exchange between Petitioner and Dulak.  Third, there was clear evidence, supplied by a medical expert, demonstrating that "the noise" Dulak was allegedly said to have heard was definitely not caused by the breaking of the victim's nose. PageID.1161, ECF No. 6-10.  Yet this medical evidence neither confirms nor calls into doubt the witnesses' testimony that Petitioner and Dulak discussed the effects of Petitioner's actions on the victim's nose after their return to Wisconsin.

Fourth, Petitioner's trial counsel cross-examined the two witnesses in question but chose not to bring up the issue of the alleged exchange between Petitioner and Dulak directly. Counsel brought out on cross-examination that the first witness had been "doing a lot of drugs" and that his "memory might be messed up because of the drugs." Similarly, on cross examination, the second witness testified that the first witness "is out there. He never pays attention to anything." PageID.1031-1032, 1064, ECF No. 6-9. Counsel also asked the first medical expert, on cross-examination, whether the victim's nose was broken, which he denied. PageID.1161, ECF No. 6-10. Fifth, the prosecution presented a strong case of guilt, even without the alleged hearsay testimony. Benson's trial testimony concerning Petitioner's beating the victim repeatedly during the robbery was far more significant to the prosecution's case than the asserted hearsay testimony. The victim's blood on Petitioner's pants and shoes placed Petitioner at the crime scene in close proximity to the victim. Petitioner's statement in his letter to his ex-girlfriend shows a sense of responsibility for the victim's death.

Therefore, the asserted Confrontation Clause error in Petitioner's case did not have substantial and injurious effect or influence in determining the jury's verdict. Petitioner's appellate counsel cannot be said to have acted outside the wide range of reasonable professional assistance when he did not raise a non-prejudicial constitutional error. Moreover, appellate counsel raised the hearsay issue on state-law grounds on direct appeal. Petitioner has not shown that raising this issue as a constitutional one would have been "clearly stronger" than raising it under state evidentiary law. Thus, Petitioner has failed to provide a valid excuse for the procedural default of his hearsay claim. Habeas relief is not available for this defaulted claim. In the opinion of the undersigned, the decisions of the Michigan Court of Appeals and the state trial court did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that due process requires a new trial because a juror expressed fear that the defendant was dangerous and would retaliate against him. The Michigan Court of Appeals rejected this claim stating:

> Buck next argues that at least one juror was prejudiced against him due to the courtroom security provided during the trial. Because he did not object or seek any other remedy, we must review this claim for plain error affecting substantial rights. *People v Pipes*, 475 Mich 267, 279; 715 NW2d 290 (2006). "Under the plain error rule, defendants must show that (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected a substantial right of the defendant." *Id.* "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

> Every defendant has a due process right to be presumed innocent, which requires that his or her guilt be determined "on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010) (quotation marks and citations omitted). The presence of courtroom security may implicate a defendant's due process right to the presumption of innocence. See *Holbrook v Flynn*, 475 US 560, 570-571; 106 S Ct 1340; 89 L Ed 2d 525 (1986). Nevertheless, "not every practice tending to single out the accused must be struck down. This is because the jurors are understood to be 'quite aware that the defendant appearing before them did not arrive there by choice or happenstance . . . .'" *Rose*, 289 Mich App at 517, quoting *Holbrook*, 475 US at 567.

> Buck claims that additional courtroom security implied to a juror that Buck was especially dangerous. When a juror inquired whether he should be cautious outside the courtroom given the presence of security in the courtroom, the trial court properly investigated the juror's concerns to determine whether he was biased against Buck. The trial court confirmed that the juror would not change any of his

answers to voir dire questions and informed the juror that the security was for control of the courtroom and did not reflect upon Buck. Defense counsel reinforced the trial court's statements, advising that the security could be there to protect Buck and that the courtroom security was not an indication that Buck posed a threat to the jury. Further, the juror stated that he was not biased.

There is nothing in the record to indicate that the presence of courtroom security was unusually alarming or troublesome. Although jurors might interpret the presence of guards as evidence that a defendant is dangerous, "[j]urors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." *Holbrook*, 475 US at 569. Here, the trial judge specifically noted at the beginning of trial that "emotions run high in this case." The trial judge further noted that he was concerned with controlling the courtroom during the trial, as courtroom control was apparently an issue in Dulak's trial. In light of these statements, it would have been entirely reasonable for the jury to assume that the additional courtroom security was due to the nature of the trial, not Buck. In addition, the trial court carefully assessed the juror's concerns and determined that he was not biased. Consequently, Buck has not established plain error affecting his substantial rights.

Michigan Court of Appeals Opinion, PageID.1601-1602, ECF No. 6-16.

Since counsel did not assert this issue at trial, it was not preserved for appellate review under Michigan procedural rules. The Michigan Court of Appeals, therefore, reviewed Petitioner's claim only for plain error. Thus, Petitioner's claim is procedurally defaulted, because the Sixth Circuit recognizes "the procedural rule requiring objection below to preserve an issue on appeal" as "both firmly established and regularly followed by Michigan state courts." *Morgan v. Lafler*, 452 F. App'x 637, 647 (6th Cir. 2011). The Sixth Circuit recognizes furthermore that a state appellate court's "plain error analysis . . . is not equivalent to a review of the merits" and, thus, no excuse of procedural default. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). In the opinion of the undersigned, the decisions of the Michigan Court of Appeals and the state trial court did not result in a decision that was contrary to, or involved an unreasonable application of, clearly

- 23 -

established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that he was denied his right to testify and was denied effective assistance of trial counsel when trial counsel induced Petitioner to waive his right to testify. Petitioner raised this claim first in his motion for relief from judgment. He thereby failed to comply with the applicable state procedural rule. Mich. Ct. R. 6.508(D)(3). The trial court, authoring the last reasoned opinion by a state court on this matter, relied on this rule in denying relief based on this claim. As noted above, federal courts deem this rule to be independent and adequate for purposes of barring further consideration of the issue in federal courts. Thus, this claim is procedurally defaulted. To overcome the procedural bar, Petitioner must show there was a reasonable probability these claims, if asserted on appeal, would have altered the outcome of his appellate proceedings. *See McFarland*, 356 F.3d at 699.

The Sixth and Fourteenth Amendments guarantee every defendant in a state criminal trial "a right to testify himself, should he decide it is in his favor to do so." *Rock v. Arkansas*, 483 U.S. 44, 52 (1987); *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000). "[W]hen a tactical decision is made not to have the defendant testify, the defendant's assent is presumed." *Webber*, 208 F.3d at 551. Therefore, when trial counsel advises against testifying, the defendant must take the initiative and "alert the trial court" that he wishes to testify. *Id.*

Here, the record shows that the trial court, after instructing Petitioner concerning his right to testify, directly asked Petitioner: "Are you waiving your right to testify?" Petitioner responded, "Yes, sir." PageID.1447, ECF No. 6-11. Petitioner concedes that his waiver was voluntary, but contends that it was "not intelligently made" because defense counsel allegedly

"induced" him to waive his right to testify because she "feared that the prosecutor would damage the defense by introducing the Defendant's prior criminal record." PageID.1859, ECF No. 6-18.  As a matter of trial strategy, seeking to prevent the impeachment of a defendant's testimony at trial by advising him not to testify is not outside the wide range of reasonable professional assistance.  *See, e.g., Jones v. United States*, Nos. 4:02–cr–52–02, 4:07–cv–1, 2010 WL 1882122, at *8 (E.D. Tenn. May 11, 2010).

Petitioner asserts that his "prior record was irrelevant" and that, alternatively, trial counsel "could have, but did not move to suppress introduction of the prior record pursuant to MRE 609." PageID.1859-1860, ECF No. 6-18.  While Petitioner is confident that his "prior record could have done no damage" (PageID.1860, ECF No. 6-18), he does not state any reasons for his confidence.  He does not elaborate which, if any, of his prior convictions would have been excluded based on MRE 609.  He also does not provide any reasons to support suppression of his prior record.  Therefore, in the opinion of the undersigned, Petitioner fails to make his case that trial counsel acted outside the wide range of reasonable professional assistance when she advised Petitioner not to testify.

Petitioner also fails to demonstrate that the outcome of his trial would have been different if he had testified.  Petitioner admitted that he voluntarily waived his right to testify. Petitioner erroneously suggests that it was only co-defendant Benson's testimony that led to his conviction.  Yet there was also evidence of the victim's DNA on Petitioner's shoes and pants that placed him near the victim.  There was finally Petitioner's letter to his ex-girlfriend.  Counsel's strategic decision can reasonably be seen as actually advantageous for Petitioner because, "[a]s a practical matter, [Petitioner] was able to get his basic story before the jury at trial without taking the witness stand, and without subjecting himself to cross-examination and impeachment." *Jones*, 2010

WL 1882122, at *8. Petitioner's taped interview with Michigan State Troopers was played at trial. PageID.1078, ECF No. 6-9. In that interview, Petitioner, in the words of the prosecutor, "distanced himself from any physical contact with" the victim and blamed Dulak instead. PageID.1455-1456, ECF No. 6-11. Petitioner's written statement to the Troopers was read into the record before the jury. Once again, Petitioner blamed Dulak for any beating that took place. PageID.1092, ECF No. 6-10. Petitioner's habeas brief in fact draws on this favorable evidence that became part of the record for the jury without his having to take the stand. PageID.29, ECF No. 1. Therefore, in the opinion of the undersigned, Petitioner has failed to show that trial counsel's performance concerning Petitioner's right to testify prejudiced him. Petitioner's appellate counsel was not ineffective for omitting this issue on direct appeal. In the opinion of the undersigned, the state trial court's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that prosecutorial misconduct deprived him of his right to a fair trial where the prosecutor incorrectly implied that Petitioner had an obligation to come forward with his version of the events before trial and where the prosecutor used Petitioner's pre-arrest silence as substantive evidence of guilt. He furthermore claims ineffective assistance of trial counsel for failing to raise this issue at trial. While Petitioner raised a prosecutorial misconduct claim on direct appeal, Petitioner raised this specific claim of prosecutorial misconduct first in his motion for relief from judgment. He thereby failed to comply with the applicable state procedural rule. Mich. Ct. R. 6.508(D)(3). The trial court, authoring the last reasoned opinion by a state court on this matter, relied on this rule in denying relief based on this claim. Federal courts deem this rule to be

independent and adequate for purposes of barring further consideration of the issue in federal courts, as noted above.  As a result, Petitioner's claim is procedurally defaulted.

The scope of habeas review of prosecutorial misconduct is narrow.  A petitioner must do more than show erroneous conduct.  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "The touchstone of due-process analysis is the fairness of the trial, not the culpability of the prosecutor."  *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The Sixth Circuit has established a number of factors a habeas court must consider when weighing the extent of prosecutorial misconduct: (1) the extent to which the claimed misconduct tended to mislead the jury and prejudice the petitioner; (2) whether it was isolated or extensive; (3) whether the claimed misconduct was deliberate or accidental; (4) the strength of the competent proofs tending to establish guilt.  *Serra*, 4 F.3d at 1355-56 (quoting *Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*)).  Additionally, the trial judge's giving of curative instructions is relevant when determining whether fundamental fairness was denied.  *Serra*, 4 F.3d at 1356.  *See also Darden*, 477 U.S. at 181-82 and *DeChristoforo*, 416 U.S. at 644.

Under the Fifth (and Fourteenth) Amendment, the prosecution may not comment on a defendant's refusal to testify.  *See Griffin v. California*, 380 U.S. 609, 614 (1965).  However, prosecutors may summarize the evidence, respond to the defense's reasonably likely contentions and tactics, and have leeway to argue reasonable inferences from the evidence in their closing arguments. *Webb v. Mitchell*, 586 F.3d 383, 396-97 (6th Cir. 2009).  Whether a prosecutor's comment violates the Fifth Amendment turns on content and context: (1) Did the prosecutor "manifestly intend[]" to

comment on the defendant's Fifth Amendment right or would a jury "naturally and necessarily" interpret the remark that way; (2) was it an isolated occurrence or part of an extensive pattern; (3) how strong was the prosecution's other evidence and (4) did the judge give a curative instruction? *Id.* at 396 (quoting *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003)).

Petitioner offers four quotes from the prosecutor's closing argument to substantiate his claim that the prosecutor incorrectly implied that Petitioner had a duty to come forward with "his version of the events before trial." PageID.24, ECF No. 1. Petitioner presents a quote from the prosecutor's summation of Petitioner's interaction with the Michigan State Troopers. In context, the italicized quote reads (PageID.1455, ECF No. 6-11):

> [T]he detectives from Michigan, didn't say- didn't tell [Petitioner] someone died. They didn't tell him someone robbed [the victim]. They didn't tell him someone stole property. They let him talk. And *Detective Belanger* laid- laid the first seed to break- break Buck down somewhat by *letting him know that maybe one of the other two guys was going to fess up and implicate Buck.* And maybe this was Buck's *opportunity to, you know, beat him- beat him to- beat him to the punch*. . . . But Buck didn't break then.

Petitioner adds a quote, found 23 pages later in the trial transcript, once again italicized in its context (PageID.1478, ECF No. 6-11):

> And *just because [Petitioner] 's admitted robbery* doesn't mean that you should disregard the felony murder. *And boy, was that a lead, Mr. Buck.* You *had no way out of* that one. *You really gave us a lot. Thanks*.

The prosecutor summarized the evidence and drew reasonable inferences. Moreover, these statements refer to Petitioner's statements that he made after being given *Miranda* rights (PageID.1073-1074, ECF No. 6-9). Even if these remarks were ambiguous – closing arguments "are seldom carefully constructed in toto before the event" and "improvisation frequently results in . . . meaning less than crystal clear" – courts should be hesitant to infer that the jury will draw from them

- 28 -

"their most damaging meaning," the one here suggested by Petitioner.  *DeChristoforo*, 416 U.S. at

646-47.

Petitioner quotes a statement made by prosecutor during closing argument as a

violation of his rights.  (PageID.1452-1453, ECF No. 6-11):

> It is clear that Mr. Buck was there.  *He admitted he was there.*  The
> DNA shows that he was there.  And that brings me to the next
> important number.  Two and a half hours.  Buck's own words in his
> statement that he gave to [Detective] Todd Johnston.  *Why is that
> significant?  He's in [the victim]'s trailer for two and a half hours.
> I don't think anyone can say that Guy Buck didn't know what was
> going on in that trailer* if he's in there for two and a half hours.
>
> We know Buck went to a back room, and yes, he spent time looking
> for property.  He also spent time carrying out property.  And I submit
> to you every time he walked by [the victim] with a piece of property
> in his hand, that made him guilty of helping create that situation of
> causing or increasing the likelihood of death or great bodily harm.  He
> was part of creating the situation.
>
> *Whether you're the guy doing the beating that ultimately killed the
> guy, or you're the guy carrying the property out, you're both just as
> guilty.  That's the law in Michigan.*[2]

In his statement to Detective Johnston, Petitioner in fact admitted that he was at the

crime scene for two and a half hours.  PageID.1092, ECF No. 6-10.  Furthermore, DNA evidence

placed him at the scene, as seen.  The prosecutor did not refer to Petitioner's "prearrest silence."

This is also true for the prosecutor's statements that Petitioner "downplayed his involvement during

his interviews with Detectives Belanger and Johnston."  PageID.1458, ECF No. 6-11; *see also*

---

[2] The Michigan Court of Appeals identified the last paragraph in the prosecutor's statement, when "[c]onsidered in isolation," to be "a misstatement of the law.  The mere participation in the underlying felony is not sufficient for a felony murder conviction."  Yet, after contextualizing this remark, the court held that the "prosecutor permissibly argued that Buck's participation in the robbery, under the specific facts of this case, indicated that he also played an active role in Keller's death."  PageID.1604, ECF No. 6-16.  This particular issue has not been raised by Petitioner on habeas review.

PageID.1455-1456, ECF No. 6-11.  This is not an inaccurate summary of what Petitioner wrote in his statement right after this interview: "I did not take part of hitting this man and I don't think Keith Benson took part of hitting him either.  We- we were just along to help [Dulak] carry stuff and go through stuff and get some cash out of it."  PageID.1090, 1092, ECF No. 6-10.

Petitioner claims that the prosecutor "[c]ompound[ed] the above errors" when he "erroneously" told the jury "what the prosecutor believed [Petitioner] was thinking when he made a statement during his interview with Detective(s) and such became, in fact, unsworn testimony by the prosecutor while bolstering the credibility of their witness."  PageID.25, ECF No. 1.  The prosecutor stated (PageID.1454, 1456, ECF No. 6-11):

> Mr. Buck made- gave a statement.  And this is my take on his statement.  *He didn't want to give up any information, or very little information. . . .*
>
> And it was interesting because during that [taped] interview [with the State Troopers] what- when [Petitioner] starts talking about his involvement, he says he was unaware [the victim] got beat up.  No one brought up anything about anyone getting beat.  So, what does that tell you?  Buck knew [the victim] got beat up.  And he knew because he was actually involved in beating him up.
>
> But he figured, I'm thinking, you know, and I can't read his mind.  This is just my take on his- you know, my interpretation.  *But because he thought that- that Dulak was dumping on him, he was going to dump on Dulak, and that's exactly what he did in his statement.*
>
> Now, he admitted there he was involved in the robbery.  But pretty much everything else was all Dulak.  *So, I think Mr. Buck was kind of upset that maybe he thought that he was going to get sold down the river by Mr. Dulak.*

The prosecutor simply summarized the evidence that was presented to the jury. Moreover, when he presented those inferences as Petitioner's thoughts, he clearly indicated to the jury that "this is my take" and "I can't read his mind," thereby clearly distinguishing his inferences

from the actual evidence.  Thus, Petitioner has failed to show any factual basis for his claim of prosecutorial misconduct.  Furthermore, the trial judge instructed the jury that the prosecutor's statements, including his closing argument, were not evidence.  PageID.521, ECF No. 6-7; PageID.1483, ECF No. 6-11.  The Supreme Court generally presumes "that jurors follow their instructions." *Penry v. Johnson*, 532 U.S. 782, 799 (2001).  In the opinion of the undersigned, the state trial court's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that the trial court's jury instruction on great bodily harm relieved the prosecution of its burden of proof on an essential element of felony murder and deprived Petitioner of his right to a fair trial and a properly instructed jury.  He also claims that trial counsel failed to object to these erroneous jury instructions.  While Petitioner raised a claim of improper jury instruction on direct appeal, Petitioner raised this specific claim of improper jury instruction first in his motion for relief from judgment.  He thereby failed to comply with the applicable state procedural rule.  Mich. Ct. R. 6.508(D)(3).  The trial court, authoring the last reasoned opinion by a state court on this matter, relied on this rule in denying relief based on this claim.  Federal courts deem this rule to be independent and adequate for purposes of barring further consideration of the issue in federal courts, as noted above.  Thus, this claim is procedurally defaulted.

Jury instructions are not cognizable in a habeas procedure, unless the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  In the case of an ambiguous instruction, the proper question is "'whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way' that violates the Constitution.  *Id.* (citing *Boyde v. California*, 494 U.S. 370, 380 (1990)).  To make these determinations, a habeas court must consider the instruction "in the context of the instructions as a whole and the trial record."  *Id.*

Here, the trial judge instructed the jury concerning the *mens rea* requirement for felony murder (PageID.1492, ECF No. 6-11):

> Second, that the Defendant had one of these three states of mind.  He intended to kill, or he intended to do great bodily harm to [the victim], or he knowingly created a very risk- a very high risk of death or great bodily harm knowing that death or such harm would be a likely result of his actions.

> Great bodily harm means a physical injury that could seriously and permanently harm the health or function of the body.

Petitioner objects to the second paragraph because he considers it to be an illicit "explanatory instruction" that, by unnecessarily drawing attention to this element of the crime, bolstered "the prosecutor's theory" and relieved him of his burden of proof.  PageID.26, ECF No. 1.  Although the alleged wrongful instruction is not part of Michigan's standard jury instruction for felony murder, it is an almost verbatim quote from Michigan's jury instruction for the related but separate crime "assault with intent to do great bodily harm less than murder" under Mich. Comp. Laws 750.84.  Mich. Crim. JI 17.7.

More importantly, Petitioner has failed to show that this error is of constitutional magnitude when taking the entire context of this instruction into account.  Contrary to Petitioner's claim, "great bodily harm" was not central to the prosecutor's "theory."  As the prosecutor pointed out at least four times in his closing argument, he intended to focus the jury on the lowest mental state required for a felony murder conviction, the knowing creation of a great risk of death or great bodily harm: "[W]e are claiming that he intended to do great bodily harm.  *And more importantly*,

we are claiming that [he] created a very high risk of death or great bodily harm." PageID.1454, ECF No. 6-11 (emphasis added). The prosecutor stated in his rebuttal, "there's three different intent instructions you consider; the intent to kill, the intent to do great bodily harm, and *the catchall*, ladies and gentlemen, *that applies to this case*, the law that our constitution wants you to apply in this case evenly for everyone, *knowingly created a very high risk of death or great bodily harm*." PageID.1477, ECF No. 6-11 (emphasis added).  See also PageID.1453, 1460, ECF No. 6-11. Therefore, Petitioner has failed to show that this alleged state-law error violated constitutional guarantees.  In the opinion of the undersigned, Petitioner has failed to show cause and prejudice for his procedural default of this issue.

Plaintiff alone claims that the jury instruction was wrong because it expressed a "transactional approach" to felony murder, rejected by Michigan law, which Petitioner summarizes as "simply because Defendant was present he could be a willing participant in the assault" (PageID.1870, ECF No. 6-18) and which Petitioner alleges the Michigan Supreme Court rejected in *People v. Randolph*, 466 Mich. 532 (2002).  Yet *Randolph* expressly rejects the "transactional approach" to, or "continuous offense theory" on, unarmed robbery including violence used after the taking; it does so in favor of the common-law approach requiring force, violence, or putting in fear to occur before or contemporaneous to the larcenous taking.  *Id.* at 536, 546.[3]  *Randolph* furthermore stated that in Michigan, felony murder has traditionally not been based on a transactional approach to robbery, but on whether an act of force or violence "was a foreseeable consequence" of the

---

[3] The transactional approach to *robbery* was codified by the Michigan legislature in 2004 in response to *Randolph*, thus overruling this particular holding of *Randolph*. *People v. Smith-Anthony*, 494 Mich. 669, 686 (2013); Mich. Comp. Laws 750.530(2).  It was, thus, in effect when Petitioner admittedly robbed the victim in 2008.

underlying felony, e.g., a robbery.  *Id.* at 549-50 (citing *People v. Podolski*, 332 Mich. 508, 515-16 (1952)).  *See People v. Maier*, No. 252310, 2006 WL 335705, at *4 (Mich. Ct. App. Feb. 14, 2006).

The trial court did not state that "simply because Defendant was present he could be a willing participant in the assault."  Instead, the court not only instructed the jury about the required mental element regarding the resulting death, but also quoted directly the third element of Michigan's jury instruction on felony murder, stating, "[t]hird, that *when [Petitioner] did the act that caused the death of [the victim]*, the Defendant was committing the crime of robbery."  PageID.1492, ECF No. 6-11; Mich. Crim. JI 16.4.  This instruction accurately reflects Michigan law on felony murder.  *Matthews v. Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003) (citing *People v. Carines*, 460 Mich. 750, 754 (1999)).   In the opinion of the undersigned, Petitioner fails to establish cause and prejudice for his procedural default.

Petitioner claims that he was deprived of his right to a fair trial when the trial court failed to provide a jury instruction on second-degree murder.  He also faults trial counsel for not raising the issue at trial.  While Petitioner raised a claim of improper jury instruction on direct appeal, Petitioner raised this specific claim of improper jury instruction first in his motion for relief from judgment.  He thereby failed to comply with the applicable state procedural rule.  Mich. Ct. R. 6.508(D)(3).  The trial court, authoring the last reasoned opinion by a state court on this matter, relied on this rule in denying relief based on this claim.  Federal courts deem this rule to be independent and adequate for purposes of barring further consideration of the issue in federal courts, as noted above.  Thus, this claim is procedurally defaulted.

Under Michigan law, "second-degree murder is first degree murder *minus* premeditation or the enumerated felony."  *People v. Garcia*, 448 Mich. 442, 472 (1995).  Petitioner, at trial, admitted to the robbery and requested to be convicted of this crime, an "enumerated felony"

under *Garcia*.  PageID.1461, ECF No. 6-11.  See also his brief supporting his habeas petition, PageID.28, ECF No. 1 ("[Petitioner] has never denied his role in the robbery.").  Second-degree murder is a lesser included offense of first-degree murder.  *Garcia*, 448 Mich. at 473.  However, the Supreme Court held that "a lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses. . . . A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser included offense." *Sansone v. United States*, 380 U.S. 343, 349-50 (1965).  Michigan law is consistent with this instruction.  *People v. Cornell*, 466 Mich. 335, 357 (2002).  The Sixth Circuit regards the failure to include a lesser-offense instruction not to be "of the character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990).  Petitioner was not entitled to a second-degree murder instruction under federal law as determined by the Supreme Court.

Therefore, Petitioner has failed to show that his state-law claim violated constitutional guarantees.  This leaves Petitioner unable to show that, when trial counsel did not object to these jury instructions, her performance fell below an objective standard of reasonableness and prejudiced Petitioner.  Therefore, since this also relieves appellate counsel of raising the issue on appeal, Petitioner's procedural default remains unexcused and bars habeas relief based on this claim.

Petitioner claims that his conviction for felony murder must be reversed because the prosecution has failed to prove Petitioner's guilt beyond a reasonable doubt.  He also faults trial counsel for not raising the issue of insufficient evidence at trial.  Petitioner raised this claim first in his motion for relief from judgment.  He thereby failed to comply with the applicable state procedural rule.  Mich. Ct. R. 6.508(D)(3).  The trial court, authoring the last reasoned opinion by

a state court on this matter, relied on this rule in denying relief based on this claim.  Federal courts deem this rule to be independent and adequate for purposes of barring further consideration of the issue in federal courts, as noted above.  Thus, this claim is procedurally defaulted.

Following *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007), the Sixth Circuit applies "two layers of deference" when reviewing a petitioner's challenges to the "constitutional sufficiency of evidence used to convict him." *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009):

> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt. . . . Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable.

Petitioner disputes that there was sufficient evidence to prove him guilty beyond a reasonable doubt either as a principal or as an aider or abettor because he lacked the required mental state as to the death of the victim.  As a matter of Michigan law, Petitioner is correct in claiming that an aider an abettor must have "the same requisite intent as a principal." PageID.28, ECF No. 1; PageID.1878, ECF No. 6-18.  *See, e.g., People v. Berrera*, 451 Mich. 261, 294 (1996).  This means that both principal and the aider / abettor must have "malice" in one of the three forms specified in Michigan's definition of felony murder, i.e., intent to kill; intent to cause great bodily harm, or intent to create a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of their actions.  *Berrera*, 451 Mich. at 294; *Carines*, 460 Mich. at 759.  However, this does not mean that principal and aider / abettor must be proven to have the identical form of malice.  *People v. Robinson*, 475 Mich. 1, 13-14 (2006).

- 36 -

Petitioner asserts that while the original plan was merely to rob the victim, he was unaware of the fact that Dulak "changed the plan," that Dulak "would escalate things" once they had arrived at the victim's home; Petitioner also claims that Petitioner "was not even in the same room when . . . Dulak started kicking [the victim] in the head 12 to 20 times." PageID.28, 29, ECF No. 1. However, Petitioner fails to mention that, according to Benson's testimony, Dulak had told his accomplices already on the way to the victim's home, "don't let me kill him," that Petitioner struck the impaired victim's head several times himself before Dulak went at him, and that he walked by Dulak several times during their two and a half hour stay at the victim's home while Dulak was beating and stomping the victim.

The Michigan Court of Appeals, while not directly addressing this claim, evaluated the weight of the evidence against Petitioner several times in its opinion and found it to be "overwhelming." PageID.1630, ECF No. 6-16. Specifically, the court noted (*Id.*):

> Benson's testimony describing Buck's actions during the robbery was far more incriminating [than contested hearsay testimony]. Moreover, there was blood on Buck's clothes that was a DNA match for [the victim], indicating he was personally involved in the beating. Finally, Buck confessed to the robbery and he said in a letter that "I wish it was [Bob] that I killed," implying that he understood that he was responsible for [the victim]'s death.

Therefore, viewing the evidence presented at trial in the light most favorable to the prosecution, it appears that a rational trier of fact could find beyond a reasonable doubt that Petitioner was guilty of felony murder and that the appellate court did not act unreasonably when assessing the evidence against Petitioner. Therefore, Petitioner has failed to show insufficiency of the evidence.

Furthermore, Petitioner has also failed to show that counsel's assistance was ineffective under *Strickland* when the insufficiency of the evidence to convict Petitioner of felony murder was counsel's main point both during her opening statement (PageID.567-571, ECF No. 6-7)

and during her closing argument (PageID.1468-1476, ECF No. 6-11). Moreover, when cross-examining the prosecution's main witness, Benson, she managed to highlight points favorable to Petitioner, i.e., that Petitioner had only come along for the robbery, did not injure the victim as badly as Dulak, and was unaware of the change in plans in Dulak's mind from robbery to murder. *See, e.g.,* 1344-1345, 1347, 1349, 1351-1354, 1357, ECF No. 6-11. Therefore, since this also relieves appellate counsel of raising the issue on appeal, Petitioner's procedural default remains unexcused and bars habeas relief based on this claim. In the opinion of the undersigned, the state trial court's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that he was denied his right to effective trial counsel. All but two of the seven subclaims have already been addressed in the discussion of Petitioner's previous claims. The two claims left are Claim X(a) that Petitioner's trial counsel was ineffective in that she failed to secure Petitioner's right of confrontation and Claim X(g) that she failed to file necessary motions to protect Petitioner's inherent rights.

Petitioner raised these claims first in his motion for relief from judgment. He thereby failed to comply with the applicable state procedural rule. Mich. Ct. R. 6.508(D)(3). The trial court, authoring the last reasoned opinion by a state court on this matter, relied on this rule in denying relief based on this claim. Federal courts deem this rule to be independent and adequate for purposes of barring further consideration of the issue in federal courts, as noted above. Thus, this claim is procedurally defaulted.

Claim X(a) is an extension of Claims II and IV concerning the admission of hearsay evidence. After the discussion of these claims above, it is clear that Petitioner's claim lacks a factual basis since trial counsel not only (unsuccessfully) objected to the admission of hearsay evidence, but also cross-examined the hearsay witnesses to impeach their hearsay testimony and got the medical expert to testify that the victim's nose had not been broken. It is, therefore, difficult to understand what Petitioner refers to when he accuses counsel of having "allowed the prosecution to subvert [Petitioner's] confrontation rights." PageID.30, ECF No. 1. Petitioner does not suggest any alternative course of action trial counsel could have or should have taken at the time. In the end, it was the court that overruled counsel's objections. Moreover, as shown above, the denial of Petitioner's right to confront a witness was at most harmless error.

As for Claim X(g), counsel's failure to file necessary motions, Petitioner has in mind "necessary, and dispositive motions such as a motion for a directed verdict, new trial, judgment notwithstanding the verdict, great weight of evidence and/or for a mistrial." PageID.31, ECF No. PageID.1886, ECF No. 6-18. In light of the record of the trial, it is clear that all these motions would have been without merit. However, trial counsel is not required to make motions that lack merit to remain within the wide range of reasonable professional assistance. Therefore, Petitioner has failed to show that trial counsel's performance fell below an objective standard of reasonableness and prejudiced Petitioner. Therefore, since this also relieves appellate counsel of raising the issue on appeal, Petitioner's procedural default remains unexcused and bars habeas relief based on this claim. In the opinion of the undersigned, the state trial court's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

In summary, the undersigned concludes that Petitioner's claims are without merit and therefore recommends that this Court dismiss the petition with prejudice.

In addition, if Petitioner should choose to appeal this action, the undersigned recommends that a certificate of appealability be denied as to each issue raised by the Petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the undersigned has examined each of Petitioner's claims under the *Slack* standard.

The undersigned recommends that the court deny Petitioner's application on the merits for Claims I, and XI-XII. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The undersigned concludes that reasonable jurists could not find that a dismissal of Petitioner's claims was debatable or wrong. Therefore, the undersigned recommends that the court deny Petitioner a certificate of appealability.

The undersigned recommends that the court deny Petitioner's application on the procedural grounds of non-cognizability (Claims I and II) and procedural default (Claims III-X).

Under *Slack*, 529 U.S. at 484, when a habeas petition is denied on procedural grounds, a certificate of appealability may issue only "when the prisoner shows, at least, [1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Both showings must be made to warrant the grant of a certificate. *Id.* The undersigned concludes that reasonable jurists could not debate that each of Petitioner's claims are properly dismissed on the procedural grounds of procedural default. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.* Therefore, the undersigned recommends that the court deny Petitioner a certificate of appealability.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:  August 2, 2016                            _____*/s/ Timothy P. Greeley*_____
                                                  TIMOTHY P. GREELEY
                                                  UNITED STATES MAGISTRATE JUDGE